Good morning, counsel. Good morning. May it please the court. Good morning, Chagokolo on behalf of the appellant, Joseph Mier. There are two issues that I want to address before you today. Can you keep your voice up, please? Sure. There are two issues I would like to address today. The first revolves around the 80-20 conundrum. The district court plucked a figure out of Dr. Krasnick's calculation, the 19.2% decrease in likelihood in purchasing the CVS product, and subtracted by 100%. After that, he determined and decided that that meant that 81% of consumers were not injured. The second issue revolves around the court's insistence to plot a supply curve in order to determine actual value. That should not be a requirement because the sales data reflects the actual value that the consumer paid, and the conjoined analysis conclusion shows a value that they actually received. So turning to the 80-20 issue, the district court misunderstood the data and reached his own expert conclusion that consumers were not injured. That was not correct. Specifically, the district court mentioned, and I quote, the 20% purchase of CVS hand sanitizers decreased by roughly 20%. He cited to paragraph 76 of Dr. Krasnick's report. He continued on to say that that roughly shows that 80% of consumers would continue to buy the product without the challenge claim. Then he finally concluded that a plaintiff's own survey suggests that the vast majority of consumers were not injured. So with regard to the 80-20 issue, that goes towards the FAL and UCL claims, right? The restitution measure. Your Honor, he denied class action for all claims based on the 80-20 issue. So that would include a negligence fraud, UCL, and the FAL. So you're probably asking, what is wrong with the 80-20? Well, here's the problem. Paragraph 76 does not say how many people are injured. It does not say that 19% or 20% of consumers were injured or not injured. Decrease in purchase does not mean injured people. Let me draw your attention. Nowhere in paragraph 76 or anywhere on Dr. Krasnick's report or anywhere before the record before you today does it say that 19% of consumers were injured. It's not part of the record. It's not even part of defendants' own experts because that is not what that says. So where does the 19.3% come from? I'd like to draw your attention to three... Can I have you go back a little bit because I'm looking at the district court's analysis. It indicated that Dr. Krasnick basically failed to account for the interaction between market demand and market supply in arriving at his price premium. With regard to the FAL and UCL claim, I think that's where the 80-20 issue, we accept that there was a misunderstanding as to the import of that analysis. Why doesn't that go only to the FAL and UCL claim? Well, Your Honor, first of all, I don't believe that the 80-20 analysis is actually at all relevant to the issues. I don't believe that was a correct understanding of the fact. But more directly to your point, the supply considerations and the maintenance considerations, I believe he limited that to the negligence and the fraud claim. And I can address those, but I was planning on doing the 80-21st, but I can switch gears through that if you like. Right. No, I'm trying to understand your argument and what we what we do with this case. So assuming that we view the record the same way you do, that the district court may have misunderstood the import of the 80-20 analysis, do we then send the FAL and UCL claims back for reconsideration of certification? I believe you would reverse it, Your Honor, because the 80-20 says that 80% of consumers are not injured. And the expert's conclusion and the report shows that everyone is injured, paragraph 87, by 18.21% of the purchase price that they paid. So therefore, everyone has been harmed, and that was the sole issue that this record had. And as far as the supply considerations that the district court mentioned, Dr. Krasner actually took supply considerations in two ways. First, he actually applied the price premium to the sales data. The sales data reflects all the prices and volume that consumers actually paid during the class period. Secondly, in the survey itself, Dr. Krasner used real prices, the prices that consumers actually paid. So what does that mean? Supply, you know, it's not that complicated. The price reflects the supply. For example, the price of product packaging, shipping, if that price goes up, the price will also go up. A good example of that would be whatever happens in the Middle East, you immediately see that in the cost of gas. That's, you know, something that's readily easy to see. So when Dr. Krasner actually took this actual sales data from class members into account and applied the price premium that reflected and anchored those prices to the real prices that consumers paid, that is all the supply considerations that he needed. And as far... Counselor, let me ask you something there on that point, if I'm confused, correct me. Ultimately, it came down to the issue in terms of, as to the fraud and misrepresentation claims, the model has to satisfy a market value analysis, correct? That's actually not correct, Your Honor, and let me just... Well, let me just finish my question then and then correct me. And then when it comes to false advertising and unfair competition, the FAL and UCLA claims, there is a different really standard, is it or not? Not quite, Your Honor. So let me address your point because I think it's an important point. The district court, for example, cited to In-Ray Mortgage Company for the proposition that there are two measures to recover under fraud and misrepresentation. One is the benefit of the bargain that's available under fraud, but we're only talking about the out-of-pocket rule. And the out-of-pocket rule, that same Ninth Circuit case actually describes what it is to take back the plaintiff's financial position prior to the fraudulent transaction. So what does that mean? That means that they paid a value, but they didn't receive the full value that they paid, and you reduce that value. Now, restitution also addresses a harm in actual value, but it's a little more broad than just the out-of-pocket rule. We're addressing this in the context of predominance requirement under 23B2. B3. B3, I'm sorry, B3. That is what we're dealing with here. And I guess my question is, is that it does seem that there's a different analysis in terms of the fraud and misrepresentation claims than there is from the FAL and UCLA claims in terms of whether or not that standard is met, depending upon how the model works. And that's why I'm asking the question about the market value applying as to the fraud claim and as to the two, what I'll call the state California law of statutory claims. Do you understand my question? Yeah. I do, Your Honor. I would address that the restitution is actually broader than the out-of-pocket rule. Restitution allows the district court to actually come up with a potential recovery that doesn't necessarily tie it up to the out-of-pocket rule. While you mentioned the market price, I feel as if I need to address this. The district court cited Anderson v. Ford Motors for the proposition that a market price equals actual value. But if you actually read the Anderson v. Ford Motors, market price is nowhere to be found in that opinion. It was not actually defining actual value to mean market price at all. But regardless, Your Honor, market price means the actual value that consumers paid, and that is what Dr. Krosnick took into account. Because he looked at the real prices in the survey, he applied those real prices, anchored to the real-world settings that people paid, and he also applied the sales data. And the sales data actually has all the intricacies as to the supply considerations. The reason for that is that every single purchase, every single thing that happened, every single volume is reflected in the sales data. And when we're looking to this analysis of a price premium, whether it be restitution or fraud in that representation under the out-of-pocket rule, we're not looking forward. We're looking backwards in time. We're looking to see where would they have been had there not been that misrepresentation or fraudulent statement. But I thought the evidence was that the CVS did not base pricing decisions on the presence of the statement at all. And so if that's the case, doesn't that suggest that there isn't any price premium? Not at all, Your Honor. I mean, that would be a very easy way for any defendant to never have liability if they have someone just say, we don't price the product because of the fraudulent statement. However, Ms. Sasek's own testimony, she stated that she looks at competitors as well that do have the fraudulent statement. And also, when she's setting a new price, she actually looks into that analysis. When she's trying to reduce the price of the product, then she's less concerned about those statements. But regardless, that seems to be an issue of fact that or expert would specify and say, look, there is a value that consumers paid and that they can easily bring that testimony at trial for the trial of fact to decide, oh, really, I don't think that there is any value for this statement. And that's the proper pathway for that to happen. It is not that this court's time at the motion for classification or at Daubert to try to figure out what is the true or falsicity. It is the time for them to find out whether the methodology is relevant and the methodologies are conducted according to acceptable principles. It is not the time for him to put his expert hat on and essentially try to figure out what is true and what is not, or look into the underlying data and try to reach their own expert conclusions. And there's a good reason for that, because that would create an issue of fact. And those issues are, it goes to the weight and not to the admissibility. I'd like to address the 80-20 before I run out of time, because I want to make sure that you guys understand the problem here. The district court mentioned the 19.3% showed that people were not injured or those were the only people injured. And he cited to paragraph 76. So I want to go through how we get to the paragraph 76 and what that means. So draw your attention to 3 ER 198. Dr. Krosnick took the first column with the claim and he averaged that. Then he took the second column without the claim and he averaged that. Then he did the first column's average minus the second column, and then he got a difference. So you see column three on the record. Then he got that difference average and he divided it by the first column's average, and he got to the 19.3%. Now you're probably thinking, well, how do we know it doesn't mean what the district court thinks it means? Well, importantly, none of the information on paragraph 75 or the table says anything about pricing information. And without pricing information, it is literally impossible for you to know whether someone is harmed. For example, suppose that a consumer purchased the CVS hand sanitizer product with the claim at a price point lower than the competitor's price, without the claim. That would show that potentially that individual has not been harmed. However, paragraph 75 only has information about with the claim and without the claim. Without pricing information, it is literally impossible for you to know whether someone has been harmed because injury is shown as you increase price because of or due to the false claim. Let me give you an analogy to make it easier. Imagine I have various baskets of oranges, and I'm trying to figure out how many are good oranges versus rotten oranges. And I do various averaging, subtraction, division, and I reach a percentage or a number. No one would believe that I could go and tell you, based on that percentage or number, how many apples are rotten. Because the information was about oranges, not apples. Likewise, the same is true here. The district court could not make a conclusion about injury because paragraph 75 is not about injury. It's the same as apples and oranges. It was an illogical conclusion. And when you have an erroneous premise that is based on an erroneous conclusion, you necessarily made a mistake. And that is exactly what we have here. Because in this case, the district court had the erroneous premise that the 19.2% showed the number of people injured, and he had the erroneous conclusion, which was that 80% of class members were not injured. And that's abuse of discretion. Your Honor, unless you have questions, I'd like to save the balance of my time for rebuttal. All right. Thank you. May it please the Court, Anthony Hoppe on behalf of CVS Pharmacy, Inc. and Vijon, LLC. Your Honors, I'd like to start with whether Survey 2 disproves damages, causation, and predominance. Really, the question here is a factual one. Did the district court misread Dr. Krosnick's survey? Did the district court read it correctly? The district court had the benefit of an extensive factual record, all of the expert reports, both Dr. Krosnick, Dr. Bradford, Mr. Scher, all of the others. He had the benefit of many hours of oral argument, where he grilled both plaintiffs' counsel and defense counsel. And based on that, the district court should be afforded substantial discretion with respect to how to read Dr. Krosnick's survey, and how to read Dr. Krosnick's testimony, how to read the moving papers, and how to read all of the other countervailing expert reports. To come to his conclusion about what Survey 2 means. Now, contrary to plaintiffs' assertion, Survey 2 did not demonstrate that 100% of the survey respondents changed their purchasing behavior 20% of the time. That's what they say in the briefs, that 20% of the time, 100% of the survey respondents changed their reaction to the label. That's not what Dr. Krosnick said, and that's not what Survey 2 said. Dr. Krosnick did not, to counsel's point, Dr. Krosnick did not do any experiments or analysis to reliably identify how each individual respondent would change their purchasing behavior when they were provided with a choice between the product that said 99.9%, the product that didn't say that. Survey Number 2 presented survey participants with a series of choices. Each product was presented to them at a range of prices. A range of prices 10% or below, 10% above or 10% below the CVS price that Dr. Krosnick had adjusted. So there was this narrow band of prices. And then the survey responses, survey respondents were asked to make a selection. Would you buy the one with the claim or without the claim? Paragraph 75 of Mr. Krosnick's report, which has been produced many times in the briefs, shows that a significant number of respondents would purchase the product whether or not it had the challenge claim. The reduction in purchases caused by removing the claim ranges from 11.35% to 26.29%. The average reduction in purchases for the product without the claim is only 19 some percent, 19.31%, which we generally round to 20 in the briefs. Meaning that approximately 80% of respondents said that they would purchase the product either with or without the challenge label. That's what that table says. And I think it's irrefutable and I think Judge Carter read it correctly. I find the survey, the way it was put together, confusing. So, and I should have asked this to your opponent and maybe he'll address it on rebuttal. But am I correct, there's five pairings and every respondent in this survey saw the same five pairings, which is maybe not in the same order? No, no. There's five pairings and the survey respondents were some suspects. Right, I understand that. But did each group see the same five pairings or are they all seeing different pairings? I think they each saw the same set of pairings and then they made their decisions and there were different prices for the pairings, right? So they made their decisions high or low, you know, which product would you purchase at X price with or without the claim? And it turned out that the results were remarkable and that it just didn't seem to matter. 80% of the time, they just picked one of the others. Right, so it's a single set of respondents responding to the five product pairs, right? Not different sets of respondents for the different pairings. I believe that, my understanding is that the survey was divided. There were 3,000 some people and they didn't each get the five pairings. Well, yeah, they each got the, one group got product one, five pairings. One group got product two, five pairings. One group got product three. So if that's what you're trying to ask. Right, right. The set of respondents responded to the five pairings. Right, and then there were differences between the different products, right? So, you know, some of the products, the difference was much narrower. For product number four, only 11.5% had a reduction in purchase rate, depending on whether it said 99% or not, right? The largest difference, I think, was product one, where it was 26%. But still, the average among all of those comes down to the 20% or so. What do you do? You take that 19.30% and then spread it back across all 100%, 100% of the people who took the survey to claim that there was a 19.30% choice, you know, uncertainty. And let me give you an analogy there. Let's say there are 100 people in this room. And I asked all 100, would you care if I turned out the lights? And 80% of them said, I don't care, no, go turn off the lights. But 20, 20 of those 100 said, no, I'm scared of the dark, don't turn off the lights. Would it be fair to say that all 100 people all had a 20% chance of being frightened if I turned off the lights? No, of course not. That's not how you read that. So what counsel is trying to say is that you need to read the survey as saying that there was a choice probability that everybody had that is spread across the 100%. That's just not the way Judge Carter read the survey. And that's not the way anybody reasonably would. Now, when it comes to lower band of prices, and nowhere in Dr. Krosnick's report does he say that the people who would select the product without the label would only select it at a lower price. It's in the briefs. Counsel says that. Plaintiff says that. But Dr. Krosnick never says that the people who would choose the product with the lower price only... Sorry, without the label would only do so at a lower price. So it does not directly prove a price premium. The only way they get to take that 19% decline and then multiply that by the sales figures. Counsel, I'll ask you the same question I asked counsel. If we find that the survey shows a statistical significance in the willingness to pay measure, what do we do with that? And does that affect all claims or just the FAL and UCL claims? It affects all claims, Your Honor, because it goes to Rule 93... Sorry, 23B3. It's predominance. It shows that the damages, the individual damages predominate over class damages and individual questions predominate over common ones. And therefore, predominance isn't satisfied for any of the claims. So that's why I wanted to start with that, because it really does affect all... Following up on Judge Wynn's question in terms of the 23B3 analysis, in the fraud and misrepresentation claims, market value is important in terms of whether or not you can measure damages on a class-wide basis, correct? Yes. Now, with respect to what I'm calling the FAL or UCLA claims, what I call the... I keep saying UCLA, I mean UCL. I know that's a heresy here in this district. I'm not sure, but probably the California influence on me. With respect to the measure of damages there, it's a different matter, is it not? It's a different analysis. It's not, Your Honor. And I want to address that. Zachariah, if you look at the Ninth Circuit's decision in Zachariah, Zachariah was both CLRA, which is not here, but fraud and misrepresentation, UCL and FAL. And the idea there was that, you know, for UCL or FAL, can you just say, can the class just say, or can the subjective belief that it was worth less than I paid? But can't the percentages there in terms of willingness to pay be calculated on a class-wide basis as to damages? I understand your argument with respect to fraud and misrepresentation and market value, but in terms of the FAL and UCL claims, it's a percentage in terms of willingness to pay that's a class-wide measure, correct? Right. Well, and that's kind of what Judge Carter said, that it doesn't affect UCL and FAL. And I submit, at least on that point under Zachariah, he was wrong. That is that, you do need to look at market value, even under the FAL and the UCL, in order to determine what the price would have been and what someone would have paid. You can't just have the subjective belief. But yes, I think Judge Carter said that the opinions were admissible under the UCL and the FAL because of this market value issue. And with respect, I'd like to move on to that market value issue. I think the plaintiff doesn't dispute that the damages model for fraud and misrepresentation requires evidence of the products but for market value. Damages are calculated by the difference between what the plaintiff gave and the actual value of what was received. Actual value means market value. That's what Zachariah says. Cases all throughout this district say actual value means market value. Market value is generally accepted as the point at which supply and demand, the two curves, cross. Right? Supply curves, the curves intersect. The point at which the buyer is willing to purchase and the seller is willing to sell. The plaintiff doesn't really dispute the rule in Zachariah. A price premium damage model requires evidence of the product's actual market value with the changed label. And I want to talk about a couple of things that counsel mentioned in terms of what Dr. Crosnick did. Again, the plaintiff doesn't change, doesn't challenge the notion that either Dr. Crosnick applied market value or he didn't have to apply market value or it doesn't matter. There's three different arguments in the briefs. But let's talk about this notion of, let's talk about Cheryl Sasek first. Cheryl Sasek was the person at CVS who sets prices. That's her job. And she did testify, to your Honor's point, that she doesn't take the label claim into account. And I think that does disprove a price premium. That is that CVS does not, the allegation of the complaint is that CVS charges more for the product with the claim than it does or would for a product without the claim. CVS doesn't do that. The facts demonstrate that they don't. The other thing that counsel has indicated is that Cheryl Sasek doesn't, at least the briefs indicate that Cheryl Sasek doesn't apply market factors, that CVS doesn't apply market factors to its pricing. That again is incorrect. Remember, Ms. Sasek said that she looks at competitors' pricing. So she looks at Dwayne Reed, Walgreens, whoever else sells similar products. I mean, where does that come from? That's the market. That's supply and demand. That's how prices are set. So CVS does set its prices based on market demand. Think about what happened during the class period. There was the pandemic. Supply and demand did intersect and did work during the pandemic, sometimes in a weird way. That is that demand for hand sanitizer shot up. And some people on eBay, everyone remembers, that people were charging exorbitant prices for hand sanitizer because demand went up and supply didn't. CVS didn't do that. CVS charged the regular prices as a service to their customers. And so to that extent, that's something else that Dr. Krasnick probably should have taken into account. During the pandemic, supply and demand would have indicated a higher price, and CVS charged a lower price. Dr. Krasnick never factored in essentially the lower price that people were given that essentially did not take into account increased demand. And then think about what happened afterwards. After vaccines became available, after the hand sanitizer, essentially a glut of hand sanitizer. I think empirically we know that if you walked into Walgreens or a Duane Reade in 2021, after there was this glut, you could buy a hand sanitizer for a quarter, anything you wanted, because it was too much. So hand sanitizer does apply, does follow the laws of supply and demand. And Dr. Krasnick never figured in the demand curve, never figured out what, I'm sorry, the supply curve, what supply would, how supply would be affected by a change in demand. And to counsel's other point, Dr. Krasnick allegedly took into account actual pricing and actual supply. Well, this is why that's incorrect. Actually, what we're talking about is a what would happen if demand fell by 20%? In the past, this was retroactive, retrospective. If, the plaintiff is saying, if I knew, I wouldn't want the product or I would pay less for it. If I knew in the past, I would have paid less. In order to figure out what that means in terms of the market, one would have to say, all right, how would supply react to a 20% drop in demand? Dr. Krasnick doesn't do that. He just takes the supply that was historically available. And that's the fallacy. That is that if you're going to take a decreased demand, you should take a decreased supply, and you should look at how the decreased supply and the decreased demand affects price. It's an absolute, it's a law of economics that is fundamental. Think about it this way. And it goes to not just the weight of the evidence, but it goes to the admissibility and the reliability of his opinions. Think about it this way. In an accident, two cars hit each other. If one of the experts disregarded Newton's second law of motion, force equals mass times acceleration, would that go to the weight of his testimony or the admissibility? And I submit that Dr. Krasnick ignoring the supply curve, which courts in this jurisdiction have said is important in these cases, ignoring that supply curve or trying to use some sort of substitute, goes to the admissibility of his opinions because they are not reliable. Unless the court has any questions, I will yield. Thank you, Counselor. May I please have a question? I'm going to be quick because I don't have a lot of time, but there's a little bit of things to unpack. First of all, your question, Your packaging and products. If you look at table 75, you'll note that if you go through each one of the lines, the number doesn't actually add up exactly to 100%. And the principle behind that is because it's based on a random sampling. It's completely randomized, whether you're getting the first product or the second product. That's why we're looking overarching in the average to see really what it means, and that's why it applies to everyone. Because if we're looking at an average, you essentially get cloned as if everyone's the same individual. Second point that I want to make is also CVS's products were the ones that had varying prices. I believe that, unintentionally, Mr. Hopp, he briefly mentioned that the prices of the competitor were the ones fluctuating. It's actually not, and you can see that in 3ER174. Next point is that Mr. Hopp mentioned Zacharia is helping them, but I think that Zacharia actually proves her point. If you look at document number 297, it shows that, in that case, Dr. Hewlett did a conjoined analysis. And what Dr. Hewlett didn't do is that he came up with hypothetical prices. He came up with a price that was random, that he thought would be good per ounce. That is in stark contrast with what Dr. Krosnick did, and you can see that contrast in 3ER387. And in that case, the district court rightfully said, hey, this is going to be way too off for the analysis. It's not really even about reliability. It's about relevance. It's not probative if it's confusing to the jury or the numbers are completely off. Because as far as reliability goes, Daubert addresses what reliability requires, margin of error, an accepted methodology, peer review, and that is all that we have done here, Your Honor. Respectfully, I just ask that you read paragraph 75. That does not contain price information, and Mr. Hopp does not address that point. Thank you. All right. Thank you very much, counsel, both sides, for your helpful arguments today. The matter is submitted.
judges: NGUYEN, FORREST, Bennett